Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

Argued March 30, 2004        Decided June 11, 2004

No. 03-1074

COALITION OF AIRLINE PILOTS ASSOCIATIONS, ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION AND
TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENTS

—————

Consolidated with
03-1076

—————

On Petitions for Review of Orders of the
Federal Aviation Administration and the
Transportation Security Administration

—————

*Kathy L. Krieger* and *John E. Wells* argued the cause for petitioners. With them on the briefs were *Jonathan A.*

—————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Cohen*, *Arthur M. Luby*, *Roland P. Wilder Jr.*, and *Katherine A. McDonough*. *James W. Johnson* entered an appearance.

*E. Roy Hawkens*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, and *Douglas N. Letter* and *Catherine Y. Hancock*, Attorneys.

Before: ROGERS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Several unions representing aviation workers challenge regulations promulgated by the Transportation Security Administration and the Federal Aviation Administration to prevent individuals who pose security threats from flying, repairing, or navigating airplanes in the United States. After the TSA and FAA promulgated these rules, Congress enacted a new law directing the agencies to accomplish this mission in a different way, prompting them to pledge formally that they would no longer enforce the regulations as written. Because these intervening events have mooted the unions' claims, we dismiss the petitions for review.

**I.**

Recognizing that "the terrorist hijacking and crashes of passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for strikes against the United States, required a fundamental change in the way [the government] approaches the task of ensuring the safety and security of the civil air transportation system," Congress enacted the Aviation and Transportation Security Act, Pub. L. No. 107–71, 115 Stat. 597 (2001), to improve security in the nation's transportation system. H.R. CONF. REP. NO. 107–296, at 53 (2001), *reprinted in* 2001 U.S.C.C.A.N. 589, 590. In order to achieve this goal, Congress created the Transportation Security Administration within the Department of Transportation and charged it with assuring "security in all modes

of transportation." 49 U.S.C. § 114(d) (Supp. III 2003). Under the Act, the TSA assumed responsibility not only for day-to-day security screening at the nation's airports, *id.* § 114(e), but also for receiving, assessing, and distributing intelligence information concerning transportation security, *id.* § 114(f)(1).

To address the possibility that pilots, aircraft mechanics, or others working in civil aviation might engage in terrorist activities, the Act requires the nascent agency to "establish procedures for notifying the Administrator of the Federal Aviation Administration . . . of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." *Id.* § 114(h)(2). The statute also directs the FAA to modify its system for issuing airman certificates in order to make it more effective at combating terrorism. *Id.* § 44703(g) (2000 & Supp. III 2003). Such certificates are required for individuals who wish to work as pilots, flight instructors, aircraft mechanics, or other civil aviation employees. One year after creating the TSA, Congress transferred the agency to the Department of Homeland Security, placing it under that Department's Under Secretary for Border and Transportation Security. *See* Homeland Security Act of 2002, Pub. L. No. 107–296, § 424, 116 Stat. 2135, 2185 (codified at 6 U.S.C. § 234 (Supp. IV 2004)).

In January 2003, the TSA and FAA issued three new rules designed to coordinate their efforts to keep dangerous individuals from infiltrating the commercial aviation system. *See* Threat Assessments Regarding Citizens of the United States Who Hold or Apply for FAA Certificates, 68 Fed. Reg. 3756 (Jan. 24, 2003) (codified at 49 C.F.R. § 1540.115); Threat Assessments Regarding Alien Holders of, and Applicants for, FAA Certificates, 68 Fed. Reg. 3762 (Jan. 24, 2003) (codified at 49 C.F.R. § 1540.117); Ineligibility for an Airman Certificate Based on Security Grounds, 68 Fed. Reg. 3772 (Jan. 24, 2003) (codified at 14 C.F.R. §§ 61.18, 63.14, 65.14). Together, these three rules—a TSA rule applicable to citizens, a TSA rule applicable to non-citizens, and an FAA rule applicable to both citizens and non-citizens—establish a system by which

the TSA determines whether any airman certificate holder (or applicant for such certificate) poses a security threat. If the TSA makes such a determination, it informs the FAA of the threat, and the FAA in turn revokes or denies the certificate. Specifically, TSA's rules, codified at 49 C.F.R. § 1540.115 for citizens and section 1540.117 for non-citizens, provide that when TSA's Assistant Administrator for Intelligence finds that any individual is "suspected of posing, or is known to pose" a security threat, 49 C.F.R. §§ 1540.115(c), 1540.117(c), the agency will serve that person, as well as the FAA, with an Initial Notification of Threat Assessment, *id.* §§ 1540.115(e)(1), 1540.117(e)(1). The individual then has fifteen days in which to request any "releasable materials" on which the Initial Notification was based, meaning information that is not classified or otherwise sensitive for security reasons. *Id.* §§ 1540.115(e)(2), 1540.117(e)(2). The individual may also file a written reply responding to the notification. *Id.* §§ 1540.115(e)(4), 1540.117(e)(4). For citizens and aliens (both resident and non-resident), TSA's Deputy Administrator then reviews the Initial Notification, any information collected by the agency, and the individual's reply to determine whether the individual poses a security threat. *Id.* §§ 1540.115(f)(1), 1540.117(f)(1). In the case of alien certificate holders, the Deputy Administrator then decides whether to issue a Final Notification of Threat Assessment or to withdraw the Initial Notification. *Id.* § 1540.117(f). In the case of citizen certificate holders, if the Deputy Administrator determines that the individual poses a security threat, TSA's Administrator will conduct a separate, independent review of the Initial Notification before issuing a Final Notification. *Id.* § 1540.115(f)(2). Under the rules, the TSA must serve on the FAA any Final Notification issued to either a citizen or alien certificate holder. *Id.*; *id.* § 1540.117(f)(2). Although acknowledging that in most cases the TSA will rely on classified or otherwise sensitive information in determining whether an individual poses a security threat, 68 Fed. Reg. at 3758, 3765, the rules provide that the TSA need not disclose such information to the certificate holder, 49 C.F.R. §§ 1540.115(g), 1540.117(g).

Under the FAA's rule, any person deemed a security threat by the TSA automatically becomes ineligible to hold an airman certificate. 14 C.F.R. §§ 61.18(a) (pilots, flight instructors, and ground instructors), 63.14(a) (flight crewmembers other than pilots), 65.14(a) (airmen other than flight crewmembers). Thus, under this regulatory scheme, the FAA will suspend the airman certificate of any person to whom the TSA issues an Initial Notification of Threat Assessment and then revoke the certificate upon the TSA's issuance of a Final Notification. *See, e.g.*, 14 C.F.R. §§ 61.18(b)(2) (suspension), 61.18(c)(2) (revocation).

Declaring that prior notice and comment would delay their ability to keep dangerous persons from holding airman certificates, the TSA and FAA both found that section 553(b) of the Administrative Procedure Act, which permits agencies to issue rules without notice and comment when they find "good cause" that "notice and public procedure ... are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b) (2000), excused advance public participation here. *See* 68 Fed. Reg. at 3759 (TSA rule governing citizens), 3766 (TSA rule governing aliens), 3773 (FAA rule). Accordingly, the agencies promulgated all three rules without notice and comment and made each immediately effective upon adoption.

In March 2003, the Coalition of Airline Pilots Associations, along with several labor organizations (collectively, "the Coalition"), filed petitions for review that asserted facial challenges to all three rules insofar as they affect citizen and resident alien airmen. (Challenges to these regulations insofar as they apply to non-resident alien airmen are resolved in *Jifry v. FAA*, No. 03–1085 (D.C. Cir. June 11, 2004), issued simultaneously with this opinion.) The Coalition claims that the regulations violate the Fifth Amendment's Due Process Clause by failing to give affected airmen a meaningful opportunity to be heard at a meaningful time, that the rules are unconstitutionally vague and overbroad, that the TSA and FAA lacked statutory authority to promulgate the rules, and that the agencies violated the APA by promulgating the rules without prior notice and comment.

Nine months after the Coalition filed its petitions, Congress enacted the Vision 100–Century of Aviation Reauthorization Act, Pub. L. No. 108–176, 117 Stat. 2490 (2003). Significantly changing the legal landscape for threat assessments and certificate revocations, this new Act, in a section now codified as 49 U.S.C. § 46111 (Supp. IV 2004), expressly requires the FAA to amend, suspend, or revoke certificates in response to TSA threat assessments:

> The Administrator of the [FAA] shall issue an order amending, modifying, suspending, or revoking any part of a certificate issued under this title if the Administrator is notified by the Under Secretary for Border and Transportation Security of the Department of Homeland Security that the holder of the certificate poses, or is suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety. If requested by the Under Secretary, the order shall be effective immediately.

Section 46111 also gives citizen airmen facing adverse certificate actions administrative appeal rights. *Id.* § 46111(b)-(g). Specifically, affected citizen certificate holders are entitled to a hearing on the record before an administrative law judge, *id.* § 46111(b), an appeal to the Transportation Security Oversight Board, *id.* § 46111(d), and the opportunity for judicial review, *id.* § 46111(e). Section 46111 also ensures that citizen airmen receive a written explanation for the agency action and all relevant documents supporting adverse certificate actions "to the maximum extent" permitted by national security interests, *id.* § 46111(f), as well as an unclassified summary of any classified information on which the FAA Administrator's order rests, *id.* § 46111(g)(3).

Days after the President signed section 46111 into law, the government moved to dismiss as moot the Coalition's challenge to the TSA and FAA rules. According to the government, this newly enacted legislation, by requiring the two agencies to provide more robust procedural protections for citizen airmen, superseded section 1540.115 and rendered it legally ineffective. The government also represented that even though nothing in section 46111 requires the agencies to

adopt new procedures for non-citizens, the TSA and FAA would nonetheless not only craft new regulations to provide resident aliens with administrative and judicial review procedures, but also cease applying the rules against resident aliens in the interim. In view of these developments, the government urged us to dismiss the Coalition's petitions as non-justiciable. The Coalition objected, and we deferred consideration of the mootness issue until oral argument. *Coalition of Airline Pilots Ass'ns v. FAA*, No. 03–1074 (D.C. Cir. Jan. 15, 2004).

Two weeks before oral argument, on March 16, 2004, the government informed us that the TSA had published its previous representations to this court in its rulemaking dockets. Its "Memorandum to the Dockets" provides:

> Although new implementing regulations have not been promulgated, the existing regulation governing certificate suspension and revocation procedures for citizens [49 C.F.R. § 1540.115] is no longer effective as to citizens. This regulation has not been applied by TSA, nor will it be applied by TSA, to citizens because it does not comport with Congress's new statutory directive.

> Although the new statute requires the FAA to take immediate certificate action when requested to do so by the Under Secretary [for Border and Transportation Security], it does not specify what appellate procedures apply when TSA determines that a resident alien who holds an FAA airman certificate poses a security threat. Nevertheless, the FAA and TSA will develop new procedures that govern resident aliens. The new procedures will contain an agency review process, followed by judicial review based on the entire record. In the meantime, TSA will not apply 49 CFR 1540.117 to resident aliens.

Memorandum to the Dockets, TSA Rulemaking Dockets Nos. TSA–2002–13732 and TSA–2002–13733, Transportation Security Administration, U.S. Department of Homeland Security (Mar. 16, 2004), *available at* http://dmses.dot.gov/docimages/ p78/273780.pdf.

Then, just six days before oral argument, the government filed a second post-briefing submission stating that the "FAA and TSA intend to issue the permanent procedures pursuant to notice and comment rulemaking." Letter from E. Roy Hawkens, Attorney, U.S. Department of Justice, to Mark J. Langer, Clerk, U.S. Court of Appeals for the District of Columbia Circuit (Mar. 24, 2004).

With a new statute on the books, a memorandum in the rulemaking dockets, and new agency representations to the court, we turn to the question of whether this case remains justiciable.

## II.

Article III, section 2 of the Constitution limits federal court jurisdiction to cases or controversies, meaning that "a live controversy must exist at all stages of review." *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997). We will thus "refrain from deciding [a case] if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Id.* (internal quotation marks omitted). Of significance to this case, however, defendants cannot usually shelter their actions from judicial scrutiny simply by claiming that they will stop the challenged conduct. As the Supreme Court has explained, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot" unless "(1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (U.S. 1979) (citations and internal quotation marks omitted) (omission in original). Moreover, the "burden of demonstrating mootness is a heavy one." *Id.* (internal quotation marks omitted).

Arguing that the two agencies' commitment to refrain from applying the challenged rules and 49 U.S.C. § 46111's enact-

ment moot this case, the government urges us to dismiss the Coalition's petitions as non-justiciable. To assess this threshold jurisdictional issue, we apply the mootness standard to each of the Coalition's claims. *See Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32, 37 (D.C. Cir. 1990) ("[C]laim specific analysis [is] required before we [can] say that appellees have met the 'heavy' burden of demonstrating mootness." (citing *Davis*, 440 U.S. at 631)).

For its primary ground of attack, the Coalition contends that by denying airman certificates without adequate notice and opportunity to be heard, the rules violate the Fifth Amendment's procedural due process guarantee. For citizen airmen, however, not only has the TSA formally pledged to cease enforcing section 1540.115, but applying that regulation would now be unlawful under 49 U.S.C. § 46111, which requires far more robust procedural protections than are available under the rule. *See Schering Corp. v. Shalala*, 995 F.2d 1103, 1105 (D.C. Cir. 1993) (finding moot a challenge to an FDA interpretation letter giving the agency discretion to define "bioequivalence" once the agency issued binding regulations defining that term). With respect to resident aliens, the agencies' commitment to draft new regulations that will provide additional administrative review procedures—a commitment made both to this court and in the formal entry in the TSA rulemaking dockets—provides sufficient assurance that the agencies will never return to section 1540.117's allegedly unlawful procedures. *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1296 (D.C. Cir. 2000) (finding a challenge moot when "there is no indication that the [agency] will revert to its past proposal"). Given the agencies' past practices, moreover, it seems highly unlikely that they would even consider using the existing regulations. Indeed, the TSA has never used section 1540.115 against a citizen. Because there is thus no reasonable expectation that the alleged due process violations will recur, the first element of mootness is satisfied.

We also think that interim events have completely eradicated the effects of the alleged due process violations—the mootness test's second element. Not only has Congress wholly displaced section 1540.115 procedures, but TSA has

abandoned section 1540.117 with respect to resident aliens, committing instead to provide them with greater procedural rights. Given these events, "[a]ny opinion regarding [the] rules would be merely advisory." *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (finding moot a facial due process challenge to regulations after the agency promulgated new ones because the old rules "cannot be evaluated as if nothing has changed").

For its second claim, the Coalition argues that the rules are unconstitutionally vague and overbroad. As the Coalition sees it, the rules fail to give fair warning of the conduct they prohibit, delegate unfettered discretion to TSA officials, and chill constitutionally protected expression. Insisting this claim remains justiciable, the Coalition argues that 49 U.S.C. § 46111's enactment not only fails to prevent likely recurrence of the asserted constitutional violations, but also, by mandating certificate suspensions and revocations when the government merely "suspects" a certificate holder of posing a security threat, guarantees that the new rules will be unconstitutionally vague and overbroad. We disagree.

To begin with, the alleged constitutional violations are unlikely to recur. Because the agencies have promised to issue their new rules through notice-and-comment procedures, the Coalition will have every opportunity to push TSA to clarify the kinds of conduct or risks the agency would consider threats to air security. Indeed, Coalition counsel acknowledged at oral argument that whether the statute perpetuates an unconstitutionally vague regulatory regime "will depend on how the agency interprets the statute." Tr. of Oral Argument at 13. Moreover, intervening events— section 46111's enactment and the agencies' representations that they will refrain from enforcing the rules—have eliminated the effects of the allegedly vague and overbroad rules. Emptied of legal effect, the challenged rules can neither chill protected speech nor punish certificate holders based on unclear standards of suspicion. Finally, to the extent the Coalition is attacking section 46111, and not the rules themselves, we lack jurisdiction to consider such a claim. If the Coalition wishes to challenge the new statute, it must do so in

the district court. *Compare* 28 U.S.C. § 1331 (2000) (district courts' original jurisdiction), *with id.* § 1291 (2000) (courts of appeals' appellate jurisdiction).

Next, the Coalition claims that the agencies exceeded their statutory authority by effectively transferring FAA's power to suspend and revoke airman certificates to the TSA. We are confident, however, that the agencies cannot repeat this asserted violation, for as Coalition counsel acknowledged at oral argument, Congress has now clearly authorized—indeed required—the FAA to take immediate action when informed by the TSA of a security threat. *See* 49 U.S.C. § 46111(a). In other words, even if, as the Coalition alleges, the agencies acted unlawfully in promulgating their rules, Congress has wholly cured the problem. Combined with the agencies' promise never to enforce the rules, Congress's action moots this claim as well.

We turn finally to the Coalition's claim that issuing the rules without advance public participation violated the APA's notice-and-comment requirement. *See* 5 U.S.C. § 553(b), (c). Because the government has advised us that both agencies intend to issue the permanent procedures pursuant to notice-and-comment rulemaking, we have little trouble finding "no reasonable expectation ... that the alleged violation will recur." *Davis*, 440 U.S. at 631 (internal quotation marks omitted) (omission in original). In addition, because the challenged rules are now devoid of any legal effect and because the agencies will use notice-and-comment procedures to promulgate the revised rules, the TSA and FAA have "eradicated the effects of the alleged violation." *Id.* Accordingly, "nothing [would] turn[ ] on the outcome" of our review of the Coalition's notice-and-comment claim. *Schering Corp.*, 995 F.2d at 1105; *cf. Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 814 n.8 (D.C. Cir. 1982) (finding that an agency's repromulgation of a challenged rule pursuant to notice-and-comment procedures mooted a notice-and-comment challenge to that rule).

For the foregoing reasons, we conclude that the petitions are no longer justiciable. At oral argument, Coalition coun-

sel, still concerned about ongoing effects of the regulations, urged that we vacate the challenged rules with respect to citizens and resident aliens even if we determine that a live controversy no longer exists. Given the government's repeated and unequivocal assurances that the regulations are already effectively dead, however, we see no need to take this additional step. Indeed, at oral argument, government counsel not only reiterated that "there clearly is no operative regulation," Tr. of Oral Argument at 18, but also represented that "the agencies have already vacated" the rules, Tr. of Oral Argument at 24, *Jifry v. FAA* (No. 03–1085). Based on these assurances that the agencies have effectively erased the regulations as to both citizens and resident aliens, we dismiss the petitions.

*So ordered.*